## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

DANNY DEWAYNE HOPPER,       )
                                        )

                Plaintiff,        )

                                        )     Case No. 14-CV-229-JED-FHM

v.                               )

                                        )

TODD FENTON and CITY OF        )
CLEVELAND, OKLAHOMA,         )

                                        )

             Defendants.     )

## OPINION AND ORDER

### I.    Background

On or about April 28, 2013, two girls, ages 8 (LM) and 12 (KG), rode their bicycles to the home of plaintiff, Danny Dewayne Hopper, who was 53 years old at that time.[1] Subsequently, on May 15, 2013, the City of Cleveland Police Department received a report that Hopper had sexually assaulted LM and KG during their April visit to Hopper's house. The day of the report, defendant Todd Fenton, a police officer for the City of Cleveland, interviewed the mothers of LM and KG. Fenton also arranged for the girls to be forensically interviewed by David Glanz, a specialist with the Child Abuse Network in Tulsa. Those interviews occurred on May 20, 2013, while Fenton watched through a two way mirror.

During Glanz's interview of LM, she reported, among other things, that Hopper had locked the girls in his bedroom, lifted LM's shirt, felt her "boobs," took off her shirt, then started "sucking them." LM also reported witnessing Hopper and KG on the bed, without clothing, and Hopper on top of KG, "holding the wee-wee into her." LM also reported that Hopper "stuck his wee-wee" inside KG, masturbated and "white stuff came out" on the bed and that KG indicated

---

[1]     As the parties have done in their briefing, the Court will refer to the girls only by initials.

it also went inside her.  According to LM's account, she also saw Hopper kissing KG from her lips all the way "down to there" and "it looked like he liked it and [KG] didn't and it was really gross when he started going down to there."  LM also stated that Hopper "has a computer and he put on some not good stuff, like all this where this girl was sucking on a wee-wee, and it was really gross."  The computer showed "stuff like naked stuff ... and all that about a girl and a boy doing that and ... he put it on where we go to see the boy's private part, a wee-wee, and me and [KG] didn't like that."

During a separate interview with Glanz, the 12 year old, KG, reported that she and LM told KG's mother that they were going on a bike ride, but instead they went to Hopper's house. KG stated, "He took me in the back room and we did it ... he stuck his thing in me," and she demonstrated with dolls that Hopper was on top of her and going up and down.  When asked about specifics, KG indicated that Hopper took her to the back room, asked her to strip, told her to lay on the bed while he removed his clothes, then laid on the bed and "sticked his thing in" her.  KG also stated that Hopper kissed her body, with his tongue "there and then he kissed in there," which "felt really weird."  She indicated that Hopper had also "French" kissed her on the lips, putting his tongue inside her mouth.  "[G]ray stuff" came out of Hopper and "went on the bed" and also went in KG.  KG reported that LM had watched Hopper having sex with KG.  KG said that Hopper's "thing" "looked really big and really bony ... [a]nd hairy a little bit," and when he put it inside of her "it hurt really bad."  According to KG, Hopper told her "don't tell anybody.  It's just our little secret."

Certain aspects of the interviews of LM and KG were seemingly inconsistent or unclear. For example, although LM reported that Hopper had touched her breasts, KG did not report seeing Hopper touch LM.  LM described the bedding in Hopper's bedroom as gray, while KG

said the bedding was white and she thought there was a red blanket on the bed.  KG denied that Hopper showed the girls anything on a computer, while LM stated that he showed them some type of nude imagery.  KG described "gray stuff" coming out of Hopper's "thing," while LM reported that "white stuff came out."  While LM indicated that Hopper locked the door, KG's account did not include that, and KG at one point gave information that suggested the bedroom door may have been open during at least part of the alleged rape.  The girls' accounts also differed as to which of the girls suggested they go to Hopper's house and which of them previously knew Hopper.  LM indicated that Hopper took the girls to the bedroom, while KG reported that Hopper asked her to come to the bedroom and she went.  LM also reported seeing a steak knife and indicated that Hopper picked it up, but KG did not describe seeing a knife.

After watching the interviews of LM and KG, Fenton prepared a search warrant affidavit. Pawnee County District Judge Jefferson Sellers signed the search warrant, authorizing the search of Hopper's residence. Although Hopper disputes the girls' accounts of what occurred, he does not dispute that the girls reported the foregoing to Glanz and that Fenton listened and utilized information from the interviews in preparing the search warrant affidavit.  Hopper's house was searched, and certain items were seized, including a gray and black comforter, 2 sheets and 3 pillow cases from the defendant's bed, and 4 steak knives with black handles, which were located in the kitchen.  Fenton arrested Hopper that day (May 20, 2013), for alleged crimes of first degree rape and lewd or indecent proposals or acts to a child under the age of 16.  The next day, Fenton signed a probable cause affidavit setting forth the alleged justification for arresting Hopper.  Hopper was held on $250,000.00 bond for almost six months in the county jail.

On November 12, 2013, a preliminary hearing was held on the criminal charges against Hopper.  KG was the sole witness questioned during the preliminary hearing, and it is undisputed

that "she had obvious difficulty understanding and responding to the questions posed to her." For example, KG was inconsistent when asked repeatedly whether it was true or a lie that the judge's robe was black or pink, and she indicated she did not understand certain questions.  On direct examination, she testified that she and Hopper went to his bedroom, he helped strip her clothes off, then stripped his own clothes off, licked from her "private up to ... [her] boobs," and then she put her clothes back on and left his house.  On cross-examination, she testified that the girls went in Hopper's house and Hopper gave them money, and they went to the gas station and bought something.  She initially indicated they returned to Hopper's house, but subsequently testified that they went home after the gas station trip.  She also provided the following testimony:

> Q.    Now, [KG], did you ever actually go back to the bedroom?
>
> A.    No.
>
> Q.    Okay.  But you have told some people different, didn't you?
>
> A.    Yeah.
>
> Q.    Okay.  Did you know at the time when you were telling these people something different that it was not true?
>
> A.    Yeah.
>
> Q.    Okay.  So that from what the Judge asked you, you're not in any trouble, so don't worry about that, so from what the Judge explained to you and the District Attorney said to you, what you told those other people would have been a lie, wouldn't it?
>
> A.    Uh-huh.
>
> Q.    Okay.
>
> THE COURT: Is that a yes or a no?
>
> THE WITNESS:    Yes.  Dang it.

Q.      Okay.  Can you tell us today why you made up some story?

A.      I didn't make it up.

Q.      Okay.  Well, you just said that you told other people things that weren't true and that it was a lie.  Was that to help someone stay out of trouble?

A.      What?

Q.      Like [LM]?  For smoking?

A.      Oh, yeah.

Following this testimony, the prosecution dismissed the charges, with costs to the state.

In this case, Hopper asserts claims under 42 U.S.C. § 1983 and state law, asserting that Fenton initiated the search of Hopper's home and arrested Hopper without probable cause and in reckless disregard of Hopper's civil rights, based upon unreliable information Fenton knew to be untrustworthy.  (Doc. 15).  According to Hopper, Fenton's affidavits supporting the search warrant and arrest were materially misleading.  (*Id.*).  The defendants, City of Cleveland and Fenton, seek summary judgment on Hopper's claims.  Fenton has invoked qualified immunity.

## II.      Summary Judgment Standards

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.  The courts thus determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Id.* at 251-52.  The non-movant's evidence is taken as true, and all justifiable and reasonable inferences are to be drawn in the non-

5

movant's favor. *Id.* at 255. The court may not weigh the evidence, and must consider the evidence in a light most favorable to the non-movant. *Tolan v. Cotton*, 572 U.S. ___, ___, 134 S. Ct. 1861, 1866-68 (2014) (per curiam).

**III. Discussion**

In resolving questions of § 1983 qualified immunity at the summary judgment stage, the courts should resolve whether, viewing the facts in the light most favorable to the party asserting injury, the facts show the officer's conduct violated a constitutional right. *See Tolan*, 134 S. Ct. at 1863. Once a defendant invokes qualified immunity in a motion for summary judgment, the plaintiff "must produce facts 'sufficient to show both that the defendant's alleged conduct violated the law and that the law was clearly established when the alleged violation occurred.'" *Bruning v. Pixler*, 949 F.2d 352, 356 (10th Cir. 1991) (quoting *Pueblo Neighborhood Health Cntrs. Inc. v. Losavio*, 847 F.2d 642, 646 (10th Cir. 1988)); *see also Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009). This is a "'heavy, two-part burden' that the plaintiff must meet," and "[f]ailure on either element is fatal to the plaintiff's claims." *Puller v. Baca*, 781 F.3d 1190, 1196 (10th Cir. 2015) (quoting *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001)).

"The plaintiff bears this heavy burden because we presume that law enforcement officers 'are immune from lawsuits seeking damages for conduct they undertook in the course of performing their jobs.'" *Puller*, 781 F.3d at 1196 (quoting *Kerns v. Bader*, 663 F.3d 1173, 1180 (10th Cir. 2011)). Ultimately, "the record must clearly demonstrate" that the plaintiff has satisfied the heavy two-part burden or the officer will be entitled to qualified immunity. *Id.* (quoting *Medina*, 252 F.3d at 1128). The courts have discretion to determine "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

Here, Hopper alleges that his constitutional rights were violated by false or misleading warrant affidavits. A law enforcement official violates the Fourth Amendment by knowingly, or with reckless disregard for the truth, making a false statement in a warrant affidavit, or knowingly or recklessly omitting from it information which, if included, would vitiate probable cause. *See, e.g., Franks v. Delaware*, 438 U.S. 154, 155-56 (1978); *Stewart v. Donges*, 915 F.2d 572, 582-83 (10th Cir. 1990); *Bruning*, 949 F.2d at 357 (citing cases). In such a case, the Court "measure[s] probable cause by (1) removing any false information from the affidavit, (2) including any omitted material information, and then (3) inquiring whether the modified affidavit establishes probable cause for the warrant." *Puller*, 781 F.3d at 1197 (citing *Wolford v. Lasater*, 78 F.3d 484, 489 (10th Cir. 1996).

In a footnote of his response, Hopper alleges that Fenton made one false statement: "Fenton makes the false statement in his prosecution affidavit that Hopper reported the girls threatened to say he 'raped' them. Hopper did not say the girls threatened to accuse him of rape. He said they (L.M.) threatened to say he 'touched' them." (Doc. 34 at 7 of 22, at fn.2). While Hopper cites the girls' mothers' May 15, 2013 statements in support of his contention, Fenton's affidavit states what Fenton was allegedly told *by Hopper* during the execution of the search warrant at Hopper's house. (Doc. 30-1 at 30). In any event, removing the allegedly false information and replacing it with Hopper's version of what he stated does not diminish probable cause. Doing so would merely change "rape" to "touch," such that the affidavit would read: "Hopper advised [Fenton] he woke up and the girls were in his house trying to steal cigarettes. He further stated the girls told him if they [sic] didn't give him [sic] cigarettes they would say he *touched* them." (*Id.*) (emphasis added to reflect modification to probable cause affidavit). Under either statement, Hopper admitted that the girls were in his home, and Fenton truthfully reported

7

in his affidavit Hopper's claim that the girls were there to steal cigarettes and the girls threatened to report that he did something wrong (either "touched" or "raped" them) if he did not give them cigarettes.  The changed wording is not material to a probable cause determination.

Hopper also complains of numerous alleged omissions in Fenton's search and probable cause affidavits.  Most of the omissions relate to (1) the failure of the girls' mothers to promptly report the girls' claims and (2) inconsistencies in details reported by KG and LM.  With respect to the first category of omissions, Fenton's affidavits did not describe a May 15, 2013 statement by LM's mother that LM had reported on April 28, 2013 that Hopper took KG's clothes off at Hopper's house, but that the mother and her husband "didn't believe [LM] because [they had] been having trouble with her lying to us and at school."  (Doc. 30-1 at 5).  The mothers did not decide to report the alleged misconduct by Hopper until May 15, 2013, after they had further discussions with their daughters.  Premised entirely on the mothers' May 15 statements to police, Hopper suggests that LM reported that Hopper had sex with KG in order to retaliate against KG for reporting that Hopper had let LM smoke cigarettes.  (*See* Doc. 34 at 6, ¶ 5 ["L.M. claimed that Hopper had sex with K.G. only after K.G. told her mother that Hopper let L.M. smoke (cigarettes)."]).

Modifying the affidavits to include LM's mother's report that LM had lied at home and school does not eliminate probable cause.  The Court is unwilling to pronounce that probable cause for an arrest - based upon a child's report of rape or sexual abuse - is vitiated as a matter of law where the child's parent informed police that the child previously lied to parents and at school.  Such a pronouncement would make troubled, delinquent, and certain disabled children easy targets for sexual assault, as it would render probable cause unobtainable merely because the child had previously lied or had a communication problem.  Moreover, including in the

affidavits the mothers' statements about lying and smoking does not vitiate probable cause, because all of the following could be true: (1) LM had previously lied to her parents and at school about issues unrelated to the claims regarding Hopper; (2) Hopper let LM smoke cigarettes; (3) Hopper had sex with KG; and (4) LM only reported the sex after KG reported the smoking.  These facts are not mutually exclusive, and none of them necessarily undermine the report of both LM and KG to Glanz that Hopper had sex with KG in his bedroom.  Girls who have lied, smoked, or been given cigarettes can be raped or witness rape.

Hopper correctly notes that LM's report of breaking through a locked door was inconsistent with the physical fact that Hopper's bedroom door apparently had no locking mechanism.  It also does not match KG's statements to Glanz that indicated that KG willingly went to Hopper's bedroom and that LM watched from the doorway.  Again, however, including the 8 year old's account and the fact that the door did not have a lock would not vitiate probable cause where both girls reported to their mothers and to Glanz that Hopper had sex with KG, a 12 year old, in Hopper's bedroom.

According to Hopper, another crucial inconsistency omitted from the affidavit was the absence of a red blanket described by KG.  (Doc. 34 at 10, at ¶ 6).  KG reported to Glanz that the bed looked like it had just been made, the sheets were white, and there was a blanket on the bed that she thought was red.  (*See* Doc. 30-4 at 17).  The search warrant return did not indicate that Fenton located any red blanket.  Including those facts in Fenton's probable cause affidavit would not have destroyed probable cause for Hopper's arrest.  The girls' visit to Hopper's home was on or about April 28, and the girls' mothers had confronted Hopper on May 10, ten days before the execution of the search warrant and Hopper's arrest.  The absence of a red blanket on May 20 would not have negated probable cause.

Hopper supplied one exhibit with his response to the summary judgment motion: a declaration of a neighbor, dated June 11, 2014.  In the declaration, the neighbor reports that on April 28, 2013, she stepped onto her front porch to smoke a cigarette and noticed two bicycles on Hopper's driveway, and she observed two little girls standing on Hopper's porch.  According to the neighbor's account, she did not see the girls go inside, but she saw them come out and leave, and they were inside Hopper's home less than five minutes.  The neighbor indicated that the night that Hopper was arrested, she told one of the Cleveland police officers outside that she had seen the girls at Hopper's house that day and that they were there for less than five minutes.  (*See* Doc. 34 at 22).

According to Hopper, "Fenton could be deemed to possess whatever knowledge his fellow officers obtained at the scene."  (Doc. 34 at 7, fn. 5).  Hopper has not provided any legal authority for that proposition.  (*See id.*).  In any event, the neighbor confirmed seeing the girls at Hopper's home on the day of the alleged rape.  Her report to a police officer that the girls were there less than five minutes is a detail that is potentially inconsistent with the girls' reports that Hopper had sex with KG.  However, Hopper has not established that Fenton was aware of the neighbor's report and, even assuming he was, including the neighbor's time report would not have vitiated probable cause merely because the timing she reported was potentially inconsistent with the girls' accounts.

Hopper also argues that Fenton's affidavits omitted "the material fact that L.M.'s descriptions of Hopper's alleged sexual conduct (including multiple ejaculations) were physically doubtful if not biologically impossible."  (Doc. 15 at 10; *see also* Doc. 34 at 8).  LM did not report witnessing Hopper ejaculate inside KG; LM reported that KG "said that white stuff from his wee-wee squirted up inside her."  LM also demonstrated for Glanz a masturbating

motion with her hand and said that "white stuff came out."  KG reported to Glanz that "gray stuff" came out of Hopper's "thing" and went into KG and on the bed.  The details reported by the girls on this issue are mostly consistent, and the report from KG (who was the one who alleged that she was penetrated) does not necessarily describe more than one ejaculation.

According to Hopper, Fenton should also have included in his affidavit that "physical medical examination of the girls produced no evidence that either of the girls was raped or sexually assaulted."  (Doc. 15 at 11, ¶ 44(l)).  However, he has offered no evidence to counter the physician's evaluation report of KG, which was conducted on May 20, 2013.  The report indicates:

> [KG's exam] is without acute or chronic signs of trauma.  A normal exam does not confirm or refute the allegations.  The majority of confirmed sexual abuse cases have normal genital exams due to the wide variety of actions that are involved in sexual abuse, the elasticity and rapid healing properties of the genitalia and the amount of time between the last incident and the exam.

(Doc. 30-5).

Fenton's search warrant and arrest affidavits were prepared following Glanz's forensic interviews with the children, and the affidavits were based principally upon what Fenton heard the children report to Glanz.  (*See* Doc. 30-1 at 24-30).  Fenton's failure to include in the affidavits a thorough analysis of every potential inconsistency in the children's reports to Glanz and to their mothers (as recounted second-hand, after the fact, by the mothers five days earlier) does not vitiate probable cause where the girls both consistently reported to Glanz that Hopper had sex with KG.  Even were all of the allegedly omitted inconsistencies included in Fenton's affidavits, the affidavits as modified would not vitiate probable cause, because the girls' statements to Glanz during the May 20, 2013 interviews supported an allegation that KG had been raped by Hopper and that LM had been fondled by him.  *See Puller*, 781 F.3d at 1197-1200

(affirming summary judgment grant of qualified immunity where arrest affidavit was sufficient to establish probable cause after removing false information and adding material omitted facts).

LM's and KG's statements to Glanz were largely consistent on the core allegation that Hopper had sex with KG.  Both alleged that Hopper and KG were nude in Hopper's bedroom, on the bed, with Hopper on top of KG.  Both reported that he kissed KG down from her mouth and described conduct consistent with Hopper performing oral sex on KG.  Both described LM being in the bathroom and/or hallway at some point in time, and both indicated that LM watched Hopper have sex with KG on the bed.  LM and KG also described "stuff" (one described it as white, the other as gray) coming out of Hopper onto the bed and KG alleged it went inside her too, while LM stated that KG had told her that it went insider her.

Moreover, while Hopper relies heavily upon KG's scrambled testimony at Hopper's pretrial hearing in order to establish that the girls lied, that testimony was given on November 12, 2013, several months after Fenton prepared his affidavits. Fenton did not have that testimony at the time of the execution of the search warrant or the May 20, 2013 arrest of Hopper, and that testimony thus cannot be utilized to support Hopper's claim that Fenton intentionally or with reckless disregard for the truth made false statements in the affidavits executed months before.

Hopper essentially asks this Court to determine, as a matter of law, that a search warrant or probable cause affidavit must include every detail an officer knows.  That is not the law.  *See Easton v. City of Boulder, Colo.*, 776 F.2d 1441, 1445 (10th Cir. 1985) (affirming summary judgment in favor of officers whose arrest affidavit did "not give all the information known to the police at the time it was prepared" and omitted inconsistencies between children's accounts of certain details related to alleged sexual assault).  Hopper asserts that Fenton had to have "objectively verifiable facts consistent solely with Hopper's guilt."  (Doc. 34 at 11, ¶ 9).  Hopper

supplies no legal authority for that proposition, and the standard he asks the Court to impose is far from the legal standard applicable to probable cause. As the Tenth Circuit stated in *Puller*:

> To establish probable cause that Puller committed a crime, [the] arrest warrant, as modified, did not have to establish proof beyond a reasonable doubt, nor did it have to establish that Puller's guilt was "more likely true than false." ... Rather, the affidavit needed only to establish something "more than a bare suspicion" that Puller committed a ... crime.

781 F.3d at 1200 (citations omitted); *see also Koch v. City of Del City*, 660 F.3d 1228, 1239 (10th Cir. 2011) ("Probable cause exists where the facts and circumstances within the arresting officer's knowledge and of which [the officer] had reasonably trustworthy information are sufficient in themselves to warrant a person of reasonable caution to have the belief that an offense has been or is being committed by the person to be arrested.").[2]

Based principally upon the mothers' statements about what the girls had reported to them before the mothers reported the alleged sexual assault to the police, Hopper argues that Fenton knew that he did not have trustworthy information supporting probable cause. The Court has reviewed the mothers' written statements, and they are not models of clarity as to what was reported by the girls. In any event, Fenton did not execute the affidavit supporting the search warrant based upon the mothers' statements; he instead waited until the completion of Glanz's interviews with LM and KG five days later, and his affidavit was based principally upon the girls' own statements about what happened. (*See* Doc. 30-1 at 24). As noted, the girls' statements were unquestionably contradictory on certain points. But both girls described Hopper

---

[2]   With respect to the search warrant affidavit, "an affidavit establishes probable cause for a search warrant if the totality of the information it contains establishes the 'fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Soderstrand*, 412 F.3d 1146, 1152 (10th Cir. 2005). The affidavit must show a "nexus between ... suspected criminal activity and the place to be searched." *United States v. Gonzales*, 399 F.3d 1225, 1228 (10th Cir. 2005) (citation omitted).

13

as having had sex and oral sex with KG and, while KG did not indicate seeing Hopper fondle LM's breasts, that does not, in itself, establish a reason to doubt it occurred.

The court in *Easton*, 776 F.2d at 1448-1451, rejected arguments similar to those made by Hopper here.  In *Easton*, the plaintiff had been accused of sexually assaulting a little boy (Michael) in the presence of another little boy (Damian).  Michael's statements were internally inconsistent, and there were also discrepancies in the boys' descriptions of the man alleged to have committed the sexual assault:

> Michael's responses to Detective Sundberg's questions were somewhat confused and differed in some particulars from the account reported earlier by Officer Wands. The transcript appears to indicate that by the time of the later interview Michael recalled only one encounter with the man, that being the occurrence involving the blanket tent in the laundry room when Michael and the man were accompanied by Damian. This time Michael denied that he had been in the man's "house" (apartment) and also denied that he had previously said he had been in the "house." ...

> It is a fact that Michael's statements concerning the occurrence of a sexual assault in Easton's apartment before the laundry room incident are self-contradictory. It is also true that Michael's later statement that he had never been in Easton's apartment was contradicted by Damian's description of the visit there after the laundry room assault. Damian's comments about the man's hair color are inconsistent with Michael's.

*Id.* at 1444, 1449.  Notwithstanding the failure of the officers to describe the inconsistencies in the affidavit supporting the arrest warrant, the court found that the arrest in *Easton* was supported by probable cause and was lawful.  *Id.* at 1450-51.

In arriving at its conclusion, the court in *Easton* noted that the "the Constitution requires no more of officers seeking a warrant (or for that matter, making a warrantless arrest) than probable cause."  *Id.* at 1448.  The Court further described probable cause:

> The standard of probable cause does not require indubitable or necessarily convincing evidence, but only so much "reasonably trustworthy information" as "to warrant a prudent man in believing that the [arrestee has] committed or [is] committing an offense." While a warrant may issue only upon a finding of "probable cause," this Court has long held that "the term 'probable cause' ...

means less than evidence which would justify condemnation", and that a finding of "probable cause" may rest upon evidence which is not legally competent in a criminal trial.

Thus even if the testimony of Michael and Damian was inadmissible in court, perhaps because of an inability to understand the oath, or for whatever reason, their statements could nonetheless be used as a basis for a probable cause determination to support the issuance of a warrant. *The existence of inconsistencies in their statements does not change this principle of law in the least. Even with respect to evidence admitted during a trial, we have noted that "[e]vidence is not necessarily insufficient merely because the witness' testimony has been contradictory and the explanations therefor difficult of belief." We would indeed be amiss if we were to hold police officers and magistrates to a stricter standard when evaluating evidence for a probable cause determination.*

Here the inconsistencies pressed by Easton do nothing to undermine the solid core of the children's statements regarding the laundry room assault and the location of the perpetrator's apartment. Nor do they detract from the detectives' impression, based on personal observation of Michael's demeanor and behavior, that his statements were spontaneous and revealed knowledge of things that a child his age could not possibly possess had an event of the kind described not occurred....

Easton also argues that because the affidavit submitted to Judge Torke by Allen and Sundberg makes no reference to the inconsistencies, and otherwise rephrases some of the children's statements, the detectives are guilty of intentionally misleading the judge. However, because the evidence excluded in no way alters the fact that the evidence included states probable cause, the warrant was valid, whatever the intent of the officers, and Easton suffered no harm.

*Id.* at 1450-51 (internal citations omitted) (emphasis added).

The Court finds the reasoning of *Easton* applicable to the inconsistencies here.  The undisputed evidence does not present any genuine dispute of material fact and defendants are entitled to judgment as a matter of law on Hopper's claims.  Hopper has provided no evidence from which it may be established that Fenton either knowingly or recklessly made false statements in, or omitted material information from, the affidavits supporting the search warrant or the subsequent arrest of Hopper.  Adding the alleged omissions would not have vitiated probable cause to believe that Hopper had committed a crime, as the girls' accounts of the core allegation (that Hopper had raped KG) were consistent in many respects at the time of the

forensic interviews.  The girls' statements during the forensic interviews supported probable cause on the charges of rape in the first degree and lewd or indecent proposals or acts to a child under 16.[3]

## IV.    Conclusion

Construed in the light most favorable to Hopper, the evidence in this case does not show any violation of Hopper's constitutional rights, as there was probable cause for the search and for Hopper's arrest.  Because there was no constitutional violation, Fenton is entitled to qualified immunity.  In addition, the same evidence is cited as the basis for the balance of Hopper's claims against Fenton and the City.  For the same reasons set forth herein and, specifically, because there was probable cause at the time of the search and Hopper's arrest, the City is also entitled to judgment as a matter of law.  Accordingly, the defendants' motion for summary judgment (Doc. 30) is **granted**.

SO ORDERED this 21st day of December, 2015.

JOHN E. DOWDELL
UNITED STATES DISTRICT JUDGE

---

[3]     Rape in the first degree under Oklahoma law includes "sexual intercourse involving vaginal or anal penetration ... [w]here the victim is under sixteen (16) years of age" and where such intercourse is "committed by a person over eighteen (18) years of age upon a person under fourteen (14) years of age." *Okla. Stat.* tit. 21, §§ 1111(A), 1114(A)(1).  Lewd or indecent proposals or acts to a child under 16 includes "[l]ook[ing] upon, touch[ing], maul[ing], or feel[ing] the body or private parts of any child under sixteen (16) years of age in any lewd or lascivious manner by any acts against public decency and morality..." and "ejaculat[ing] upon or in the presence of a child ... or requir[ing] a child to look upon the body or private parts of another person or upon sexual acts performed in the presence of the child...." *Okla. Stat.* tit. 21, § 1123(A)(2), (5).